Jacques MOREAU, et al.,
Plaintiffs-Appellees,

v.

Egon OPPENHEIM, et al.,
Defendants-Appellants,

v.

Virginia H. ZIMMERMAN,
Intervenor-Appellee.

ALDURO–RAYNES ARABIANS, INC.,
Plaintiff-Appellant,

v.

Jacques MOREAU, et al.,
Defendants-Appellees.

Nos. 81–2159, 81–2279.

United States Court of Appeals,
Fifth Circuit.

Dec. 2, 1981.

Rehearing Denied Jan. 25, 1982.

---

William Pannill, Houston, Tex., for plaintiffs-appellees in No. 81–2159.

James L. Walker, Houston, Tex., for intervenor-appellee.

Reynolds, Allen, Cook, Pannill & Hooper, Houston, Tex., for plaintiffs-appellees in No. 81–2279.

John O. Tyler, Jr., for plaintiffs-appellees in both cases.

Before GEE and RUBIN, Circuit Judges, and SPEARS,* District Judge.

GEE, Circuit Judge:

This case turns on the construction of a series of transactions between the Oppenheims, American owners of a horse-breeding operation in Texas, and the Moreaus, French citizens formerly engaged in the breeding of pureblood Arabian horses in southern France. The central question at trial was whether the Moreaus had been the victims of a scheme involving malicious overreaching or whether they had simply backed out of a contract that had gone sour. As might be expected, the parties' descriptions, both at trial and on appeal, of the terms of the agreements at issue vary considerably.

According to the Moreaus' version, they were approached by the Oppenheims with a proposal whereby the Oppenheims would obtain the use of the Moreaus' horses while the Moreaus would retain ownership. In furtherance of this, the parties entered into a "joint venture." A 1979 Memorandum of Understanding between the parties provided, in two language transcriptions that differed in material content, for the formation of a corporation. By the French transcription, the Moreaus and the Oppenheims would each contribute $30,000, the parties would have equal voting and nonvoting stock, and in no event would stock be issued to any party prior to the Moreaus' arrival in the United States to stay. The English

Joe A. Izen, Jr., Houston, Tex., for Raynes Arabians.

L. T. Bradt, Spring, Tex., for Oppenheim in No. 81–2159, and for defendants-appellants in No. 81–2279.

* District Judge of the Western District of Texas, sitting by designation.

version of the memorandum, unbeknownst to the Moreaus—who allegedly could not read English and who relied on the Oppenheims for interpretation of the documents—provided for the corporation's formation within sixty days and contained other material variations from the French one. The Oppenheims represented to them, the Moreaus testified at trial, that various contractual provisions contained in both transcriptions, including a provision in the memorandum that the horses would be sold to the corporation, would not be enforced but were needed for "immigration purposes." Alduro-Raynes Arabians, Inc. was incorporated on May 10, 1979. The parties were duly elected officers and directors. According to the Moreaus' testimony, the Oppenheims represented to them that no stock would be issued until each party paid $30,-000 and in no case before the Moreaus arrived in the United States to stay. On October 19, 1979, however, the Oppenheims held a meeting of the shareholders, allegedly without notice to the Moreaus, at which the Moreaus were removed as directors and, at a subsequent directors' meeting, were removed as officers. The Moreaus then arrived in the United States with their eight horses. At a meeting between the parties on November 22, 1979, at the Oppenheims' farm, the Oppenheims demanded that the Moreaus sell Arbor, the Moreaus' prize stallion that had recently won the European championship, and the other horses to the corporation. When the Moreaus balked at this, the Oppenheims refused to permit the horses to be removed from their farm. The Oppenheims then terminated the Moreaus' formal employment by Alduro-Raynes and encouraged the immigration authorities to deport the Moreaus from the United States on the basis that they were now in violation of their entry visas.

The Oppenheims describe their agreement with the Moreaus as one to import the horses into the United States, where the horses, particularly the stallion Arbor, would be sold to Alduro-Raynes. They deny that they made any oral representations to the contrary concerning the sale of the horses. The Oppenheims further deny that the Moreaus relied on them for interpretation of their "arms-length" contract and assert that, because they were so anxious to leave France, the Moreaus were the first to propose the sale of the horses to the American corporation. According to the Oppenheims, the Moreaus were properly removed as directors and officers of Alduro-Raynes because, while the Oppenheims had deposited money with the corporation and had been properly issued shares, the Moreaus had not done anything to fulfill their part of the bargain by October 1979. The Oppenheims further deny that there was ever any intention to form a joint venture, assert that, while they composed the original draft of the agreements, the Moreaus drafted the final versions, and deny that there was ever any agreement prohibiting the issuance of stock before the Moreaus' arrival in the United States. Other factual assertions made by the Oppenheims at trial and on appeal are discussed, together with their legal arguments, below.

Alduro-Raynes first brought suit for damages and declaratory judgment in Texas state court, but this action was removed by the Moreaus to the Southern District of Texas and consolidated with the Moreaus' suit alleging fraud, breach of fiduciary duty, conversion, tortious interference with contract, and civil conspiracy. During the course of proceedings, one Zimmerman was appointed receiver of the horses. On December 7, 1979, an agreed injunction was entered, prohibiting any party from selling, transferring, or in any way attempting to change the ownership status of the horses pending further order of the United States district court. The suit proceeded to trial, the jury rendering a verdict on March 5, 1981, for the Moreaus on four of the five asserted causes of action—fraud, breach of fiduciary duty, conversion, and tortious interference with business and contractual relations—and assessing $50,000 in compensatory damages. The jury further found that the Oppenheims' actions were done willfully and intentionally or with callous and reckless indifference to the rights of the Moreaus but declined to award punitive dam-

ages. The district court entered judgment and assessed as costs the amount claimed by the receiver for the care of the animals and, in addition, attorneys' fees. The horses (except Arbor, who had died in April 1980) were released to the Moreaus in May 1981, but both before and after trial the Oppenheims contacted the Arabian Horse Registry of America in an effort to prohibit the registration of the horses in this country, thus successfully prohibiting the Moreaus from breeding their horses and selling the offspring.

This court granted a stay of the money damages of the judgment, along with expedited appeal. We referred the Moreaus' request for a post-judgment injunction to the district court, and on June 17, 1981, the trial court enjoined the Oppenheims from "attempting to prevent the Moreaus from registering their horses with the Arabian Horse Registry of America, Inc." and from initiating or facilitating deportation proceedings against the Moreaus. The Oppenheims here appeal from the March 23, 1981, judgment, as well as from the post-judgment relief granted, alleging numerous points of error in the proceedings in the district court. We affirm.

I. *Sufficiency of the evidence.*

■ The Oppenheims assert that the trial court erred in failing to hold that, "as a matter of law," the appellants were entitled to recover damages from the appellees for breach of contract and interference with business relations. This is a thinly disguised claim that there was an insufficient evidentiary basis for the jury's verdict. Appellants, however, do not show that they filed motions for either directed verdict or judgment notwithstanding the verdict, and thus our review is limited to recognition of plain error apparent on the face of the record. Wright & Miller, *Federal Practice & Procedure*: Civil § 2536 (1971); *Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 511 (5th Cir. 1970).

■ Much of the evidence at trial presented the jury with credibility choices between witnesses. Our review of the trial record leaves us with little doubt that the jury verdict is untainted by plain error and is, to the contrary, supported by ample evidence. Repeatedly, the jury saw the trial testimony of the Oppenheims impeached by reference to their earlier deposition testimony. They heard Mrs. Oppenheim admit that she and her husband never had any intention of contributing $30,000 to Alduro-Raynes, as stipulated in the memorandum of understanding between the parties.[1] Mr. Oppenheim testified that he mailed the Moreaus a notice of the directors' meeting (in which the Moreaus would be removed from the corporate board) only two days before the meeting was to be held, knowing full well that the letter would take a minimum of four days to reach the Moreaus abroad.

The jury also heard Mrs. Oppenheim apparently contradict her own trial testimony on an important issue. In brief, the central factual issue on which both the Moreaus' and the Oppenheims' contract claims turned was a simple one: did the contract provide and did the parties intend from the outset to have title to the horses transferred to the Alduro-Raynes corporation, or did the Oppenheims represent to the Moreaus that the

---

1. Q  Mrs. Oppenheim, all I want you to do is tell the jury the truth. I want you to tell them whether or not it was ever your intention to pay $30,000.00 cash to this corporation or whether you were going to contribute a truck, a tractor and a trailer and other equipment in lieu of your $30,000.00.
A  We were not going to pay cash $30,000.00 because all that you mentioned plus the feed, the hay, the Alfalfa and everything in storage was in excess of $30,000.00.
Q  All right. And it is true, then, that you were going to make contributions in the form of hay and feed and equipment and you wouldn't have to put up $30,000.00? That is your testimony, isn't it?
A  That is true, because the $30,000.00 from us, plus the $30,000.00 from them was toward management, the operation of the farm, which costs about $10,000.00 a month.
Q  Well, help me, if you will, please ma'am. Look at the English version, the French version or anything you want to. Tell us if you can find anything in those contracts where you are not going to pay $30,000.00, but you are going to contribute feed or equipment in lieu of $30,000.00. It is not in there, is it?
A  No, sir.

horses were being formally conveyed to the corporation merely for "immigration purposes" and that the corporation would never own the horses. Although both Mr. and Mrs. Oppenheim early in the trial vehemently denied having made any such representation, Mrs. Oppenheim admitted on the last day of testimony on direct examination no less than four times that such a representation had in fact been made.[2] The jury, therefore, had ample grounds to conclude, inter alia, that the Moreaus' version of the agreement between the parties was the more accurate one and that the Moreaus—not the Oppenheims—had suffered damage from interference with business relations and contract rights.

## II. *Illegality.*

The Oppenheims next urge us to hold that, as a matter of law, illegal aliens who cannot legally enter into contracts in this country cannot recover for tortious interference with prospective contracts. The Oppenheims would have this court overturn the jury verdict below on the ground that the Moreaus represented to the United States Immigration & Naturalization Service that they were shareholders in a Texas corporation to which they would sell their horses and that the Moreaus did this in order to obtain their visas, yet never had any intention of selling their horses to the corporation and were therefore in the United States as a result of false representations in violation of 8 U.S.C. § 1325,[3] and 18 U.S.C. § 1546.[4] Arguing that the Moreaus' misrepresentation amounts to a felonious conspiracy to defraud the United States under 18 U.S.C. § 371,[5] the Oppenheims contend that any contracts entered into by

**2.** A All right. Now, as of June 1979, were you present during discussions with the Moreaus concerning any problems with the importation of the horses?
A Yeah. We have talked about that.
Q All right. Did you ever make any representations to the Moreaus that the corporation would have to own their horses in order for the corporation to import—
A In order for them—
Q —in order for the corporation to import the horses?
A Yes.
. . . .
Q .... Did you ever tell Madame Moreau to your knowledge that you recall, that the corporation had owned her horses *in order* for them to be imported?
A Yes.
[COUNSEL FOR THE MOREAUS]: Your Honor, that question has been asked and answered four times.
THE WITNESS. Yes.
[MOREAUS' COUNSEL]: And she has answered "Yes" every time.
THE COURT: Okay.
[MOREAUS' COUNSEL]: I am objecting to this.
THE COURT: It must be the right answer.
[OPPENHEIMS' COUNSEL]: That's not my question. I don't think she answered that question, Your Honor.
THE WITNESS: Yes. The horses had to be imported. (Emphasis added.)
A generous interpretation of Mrs. Oppenheim's testimony would be that she only admitted to telling the Moreaus that the corporation would have to own the horses to import them but that she did not admit telling them that the

corporation's ownership would only be a "sham" one, limited to the sole purpose of importing the horses. The jury, however, was urged to adopt a less generous interpretation by Moreaus' counsel on closing argument. The jury was certainly entitled to take a dim view of what is ultimately ambiguous testimony.

**3.** Any alien who ... obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall, for the first commission of any such offenses, be guilty of a misdemeanor and upon conviction thereof be punished by imprisonment for not more than six months, or by a fine of not more than $500, or by both, and for a subsequent commission of any such offenses shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not more than two years, or by a fine of not more than $1,000, or both.
8 U.S.C. § 1325.

**4.** 18 U.S.C. § 1546 states, in pertinent part:
Whoever knowingly makes under oath any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement—
Shall be fined not more than $2,000 or imprisoned not more than five years, or both.

**5.** 18 U.S.C. § 371 provides, in part:
If two or more persons conspire either to commit any offense against the United

the Moreaus would be the illegal fruits of such a conspiracy and cannot be enforced.

Alternatively, the Oppenheims argue that, even if the Moreaus had made no misrepresentations to the United States immigration authorities in their initial entry into the United States, their subsequent "refusal to work for the Alduro-Raynes corporation effected a failure to maintain the status under which they were admitted into this country" and required them to depart this country under 8 U.S.C. § 1184(a).[6]

In either case, the Oppenheims urge us to hold that the Moreaus, as illegal aliens, had no right to come into federal court and demand damages for "what [they] could have earned by entering into and performing illegal employment in violation of the regulations and laws of the United States." To this end, the Oppenheims attempt to distinguish cases permitting aliens to utilize our courts [7] on the ground that these were instances of aliens who were legally in this country and were attempting to recover for their *past* labors, whereas here allegedly illegal aliens are claiming tortious interference with *prospect ve* business relations.

■ The Moreaus argue that the Oppenheims' illegal-alien contention was never set forth in a pleading below pursuant to Fed. R.Civ.P. 8(c) and is not open to review here. We disagree. The Oppenheims' second amended answer alluded, albeit ambiguously, to a defense of "illegality." Further, counsel for the Oppenheims stated in the charge conference that, "It would be our position that the Moreaus had no legal status to work in the United States which could be recognized to give them this tortious interference with business relations and contract rights." But, while reviewable, the Oppenheims' illegality claims are wholly without merit.

■ Each part of the Oppenheims' novel argument is bound by tenuous threads that unravel upon examination. In the first place, questions of the Moreaus' immigration status or of their alleged violation of the immigration laws were never presented at trial, and we cannot be expected to answer them here. *See, e. g., Arteaga v. Allen*, 99 F.2d 509, 510 (5th Cir. 1938). Contrary to the Oppenheims' allegations, there is no evidence in the record that the Moreaus entered this country illegally. The Oppenheims have not shown that deportation hearings were under way against the Moreaus and, in fact, by their motions in limine prior to trial, the parties agreed not to mention the existence or nonexistence of such proceedings or to make any reference of any kind to the immigration status of the Moreaus. Second, we question, without necessarily resolving, the Oppenheims' argument that a misrepresentation in violation of 8 U.S.C. § 1325 and 18 U.S.C. § 1546 results in a withdrawal of the access to federal court guaranteed all "persons" under the due process clause of the fourteenth amendment as codified at 42 U.S.C. § 1981.[8] Even assuming that violations of the immigration laws by the Moreaus occurred, the remedy for these violations is, according to

States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**6.** 8 U.S.C. § 1184(a) states:

(a) The admission to the United States of any alien as a nonimmigrant shall be for such time and under such conditions as the Attorney General may by regulations prescribe ... to insure that at the expiration of such time or upon failure to maintain the status under which he was admitted, or to maintain any status subsequently acquired under section 1258 of this title, such alien will depart from the United States.

**7.** *See, e. g., Takahashi v. Fish & Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); *Roberto v. Hartford Fire Ins. Co.*, 177 F.2d 811 (7th Cir. 1949).

**8.** 42 U.S.C. § 1981 states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

the statutes cited, criminal sanctions, not denial of access to court. We seriously doubt whether illegal entry, standing alone, makes outlaws of individuals, permitting their contracts to be breached without legal accountability. *See, e. g., Arteaga v. Allen, supra; Martinez v. Fox Valley Bus Lines, Inc.,* 17 F.Supp. 576 (N.D.Ill.1936). Third, the Oppenheims' alternative allegation— that the Moreaus' refusal to complete their contractual agreement put them in violation of their visas—is a hollow and empty Trojan horse in the context of this case. The argument assumes central contested issues at trial: whether any party was in breach of contract and whether a contract existed. On one view of the facts, the view accepted by the jury and which we do not disturb, the Oppenheims' malicious termination of the Moreaus' employment with Al-duro-Raynes was responsible for putting the Moreaus in technical violation of their visas. Given this jury finding, the Oppenheims are estopped from claiming that the absence of an employment contract makes the presence of the Moreaus in this country illegal.[9]

### III. *Shareholder standing.*

The Oppenheims' third major quarrel with the proceeding below concerns the absence of a jury instruction stating that only a shareholder may complain of the removal of a corporate officer. The district court below refused such an instruction and instead informed the jury of the Moreaus' claim of breach of fiduciary duty:

> Under this legal theory the Moreaus claim that the Oppenheims breached their fiduciary duties to them by the holding of

a shareholders' and a directors' meeting of the corporation in October of 1979 and removing the Moreaus as directors and officers.

> A fiduciary relation applies to any person who occupies a position of confidence toward another. It is a relationship involving trust and confidence. A fiduciary relationship exists where special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing the confidence.

> You will find for the Moreaus on their claim for breach of fiduciary relationship if you find that they have proved by a preponderance of the evidence that a fiduciary relation existed between the Moreaus and the Oppenheims and that the Oppenheims failed to act in good faith with due regard to the Moreaus' interest. You will find for the Oppenheims on this claim if you find that the Moreaus have failed to prove by a preponderance of the evidence that a fiduciary relationship existed or if you find that the Oppenheims have proved by a preponderance of the evidence that they have acted in good faith and with due regard to the Moreaus' interest.

The Moreaus admit that they did not contribute any funds to the corporation and were therefore not entitled to any stock. They counter, however, by citing *Thompson v. First State Bank of Amarillo,* 109 Tex. 419, 211 S.W. 977 (1919), and article 12, section 6 of the Texas Constitution,[10] codified in article 2.16 of the Texas Business Corporation Act,[11] arguing that "stock is-

**9.** Note that in so doing we are not *enforcing* an illegal contract, as the Oppenheims claim. Even accepting the Oppenheims' questionable view of immigration law as correct, it would be the absence of employment that would make the Moreaus' presence in this country illegal.

**10.** "Sec. 6. No corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void."

**11.** The Act states, *inter alia* :

A. The consideration paid for the issuance of shares shall consist of money paid, labor done, or property actually received. Shares may not be issued until the full amount of the consideration, fixed as provided by law, has been paid. When such consideration shall have been paid to the corporation or to a corporation of which all of the outstanding shares of each class are owned by the corporation, the shares shall be deemed to have been issued and the subscriber or shareholder entitled to receive such issue shall be a shareholder with respect to such shares, and

sued to appellants [the Oppenheims] and voted by them was for an insufficient consideration and for which full and lawful payment was not made .... [A]s such, any exercise of the rights which normally accompany stock ownership is void."

■ We do not need to resolve the question of whether the Alduro-Raynes stock issuance was in fact void. On our review of the record, there was ample reason for the trial judge to conclude that an instruction on shareholders' standing was not applicable to the Moreaus' claim and would only confuse the jury. In this case there was evidence that the Moreaus, French citizens who purportedly spoke little or no English, trusted the Oppenheims to explain the transaction and the American law on which the "joint venture" would be based. The trial court correctly viewed the dubious corporate legality of Alduro-Raynes as irrelevant. The real issues for the jury to determine were whether a fiduciary relationship existed between the parties and whether the duty to inform the Moreaus concerning the directors' meeting and to act according to their fiduciary obligations was breached by the Oppenheims. The "shareholder status" of the Oppenheims vis-a-vis the Moreaus is insignificant if, in achieving that status, the Oppenheims breached a fiduciary relationship.

■ *Thompson v. First State Bank of Amarillo, supra*, is instructive. In that case the Texas Supreme Court found that a subscriber to bank stock who gave only a promissory note for issuance of corporate stock was estopped from asserting the invalidity of the issuance in a creditor's suit to enforce the note. In this case, the Oppenheims' purported breach of their fiduciary relationship—including their issuance of shares

without consideration and subsequent ouster of the Moreaus as corporate officers without notice—prevented the Moreaus from achieving shareholder status. The district court was correct to direct the jury to the question of the existence of the fiduciary duty. If the Oppenheims breached their duty, they are estopped from claiming a defense based on that breach. If the Moreaus cannot claim shareholder status, the Oppenheims, who never fulfilled their part of the agreement as to contributive share either, can hardly claim this status. It is a well-established rule of equity that one who by his conduct has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss or injury to the other.

## IV. *Indispensable parties.*

The Oppenheims claim error in the district court's failure to require the joinder of Florence and Sylvie Moreau-Sipiere. The Oppenheims claim that these two individuals were owners of two of the horses and were indispensable parties to Alduro-Raynes' declaratory action for title to the horses. The district court below denied the Oppenheims' motion to dismiss for lack of indispensable parties.

■ Assuming that the Oppenheims are correct and that these two individuals do have an ownership interest in the horses, the appellants' reliance on Rule 19, Fed.R. Civ.P.,[12] is misplaced. Under the flexible federal joinder rules, "pragmatic concerns rather than conclusory labels now control." Wright & Miller, *Federal Practice & Procedure* : Civil § 1612 (1972). *See also Provident Tradesmens Bank & Trust Co. v. Pat-*

---

the shares shall be considered fully paid and non-assessable."

**12.** Rule 19(a), Fed.R.Civ.P., states, in pertinent part:

Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be

accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest...

*terson,* 390 U.S. 102, 118–19, 88 S.Ct. 733, 742–743, 19 L.Ed.2d 936 (1968). Cases under Rule 19 stress the equities of a particular case, not conclusory classifications of property rights. Rule 19 permits courts to retain jurisdiction "where the interests of substantial justice require it," *Rippey v. Denver United States National Bank,* 260 F.Supp. 704, 708 (D.Colo.1966), and this means, as the rule itself states, that an interest in disputed property does not make a party indispensable unless in his absence relief is impossible or the absent person is likely to be prejudiced or his absence will lead to multiple litigation. *See, e. g., Hansen v. Peoples Bank of Bloomington,* 594 F.2d 1149 (7th Cir. 1979); Wright & Miller, *Federal Practice & Procedure*: Civil § 1609 (1972). The Oppenheims do not and presumably cannot argue that the absentees were prejudiced by the judgment actually rendered, and they cannot claim to face future duplicitous litigation as a result of the trial court's failure to join these two parties. The Oppenheims were never in a position to claim relief that they could have sought to assert against the absent persons, and the absent parties' rights were never implicated in the questions for jury decision below. Thus, since the traditional appellate court concerns when failure to join an indispensable party is urged as error are absent here, the Oppenheims' claim must fail.

### V. *Jury instructions.*

■ The jury was charged as to the breach of contract claim as follows:

The Oppenheims and Alduro-Raynes Arabians, Inc. contend that the Moreaus breached their contractual duty under the memorandum of understanding by failing to convey title to the horses to the corporation, Alduro-Raynes Arabians, Inc. In order for you to find that there has been a breach of contract by the Moreaus, you must find that the Oppenheims or Alduro-Raynes Arabians, Inc., have proved by a preponderance of the evidence that the Moreaus actually agreed to convey title to their horses to the corporation as written in the memorandum of understanding. The Moreaus deny that there

was such an agreement and say that the language having to do with the transfer of title was inserted in the memorandum of understanding solely for the purpose of aiding in their immigration and in the importation of the horses into the United States.

The Oppenheims allege that the jury should have been charged as to "the evidentiary presumptions of law pertaining to contractual relationships." This claim is meritless. The parties cite us to no case in which such an omission is found to constitute an abuse of the broad discretion federal courts enjoy in this area. Here the district court could well have concluded that amplification of the jury charge was unnecessary, *i. e.,* that ordinary citizens know that parties are usually bound by what they sign. Alternatively, the judge could have decided that, since the Moreaus signed conflicting versions of the memorandum of understanding, the requested instruction would only prove confusing or misleading to the jury. *See generally* Wright & Miller, *Federal Practice & Procedure*: Civil § 2556 (1971).

■ The Oppenheims' second challenge is directed at the jury instructions concerning fraud. The court instructed the jury that:

The Moreaus contend that the following representations made by the Oppenheims constitute fraud .... Representations made concerning American Texas law and Egon Oppenheim's power as president of a corporation.

The argument is that fraud cannot be predicated upon misrepresentation as to matters of law. The short answer to this is that a misrepresentation of law between fiduciaries is a horse of a different color. *Meacham v. Halley,* 103 F.2d 967 (5th Cir.) *cert. denied,* 308 U.S. 572, 60 S.Ct. 86, 84 L.Ed. 480 (1939) (misrepresentation of law between fiduciaries may be actionable); *Safety Casualty Co. v. McGee,* 133 Tex. 233, 127 S.W.2d 176, 177 (Com'n App.1939).

### VI. *Other claims.*

■ The Oppenheims' litany of other claims of error can be briefly disposed of.

Those based on the district court's failure to realign the parties and its denial of Alduro-Raynes' alleged procedural right to open and close the case are frivolous. The matter of a court's allocation of the right to open and close, even if it properly belonged to Alduro-Raynes, does not go to the merits of a controversy and has long not been the subject of writ of error,[13] even when coupled with the denial of requested party realignment. *Commercial Iron & Metal Co. v. Bache Halsey Stuart, Inc.*, 581 F.2d 246, 250 (10th Cir. 1978). The decision rests with the sound discretion of the trial court. *Martin v. Chesebrough-Pond's, Inc.*, 614 F.2d 498, 501 (5th Cir. 1980).

Certain invoices relating to the importation of the horses, while perhaps admissible evidence, were not shown to have implicated a substantial right, and the court did not abuse its discretion in excluding them from evidence. Fed.R.Evid. 103(a); Fed.R.Civ.P. 61; *United States v. Medel*, 592 F.2d 1305, 1314 (5th Cir. 1979).

The court also did not act improperly when it assessed attorneys' fees for the intervenor, Zimmerman, against the losing party. The Oppenheims make no serious contention that there is a genuine factual issue as to the amount of recoverable attorneys' fees. As stated in 6A Moore, *Federal Practice* ¶ 59.05[4] (2d ed. 1979), "It would be a mere formality to order a partial new trial limited to the issue of damages when the court could immediately thereafter grant summary judgment for the undisputed amount." As the First Circuit put it in *Decato v. Travelers Insurance Co.*, 379 F.2d 796, 798 (1st Cir. 1967):

The constitutional rule against additur ... is not violated in a case where the jury had properly determined liability and there is no valid dispute as to the amount of damages. In such a case the court is in effect simply granting summary judgment on the question of damages. (footnote omitted). As in that case, "the only question here is whether the damages were truly in dispute, or were conclusively shown." *Id.* at 799 (footnote omitted). *See also Stentor Electric Manufacturing Co. v. Klaxon Co.*, 125 F.2d 820, 826 (3d Cir. 1942) (addition to verdict of an amount due as interest does not revise jury's verdict when New York statute allows for such interest and it did not appear that jury was so instructed).

The Oppenheims' claim that they could not have been guilty of conversion when they refused to allow the horses to be removed from their farm in November 1979 because they had "a valid claim for reimbursement of livery expenses" fails to take into account the crucial fact that their claim of right is grounded on action that a jury, on the basis of solid evidence, has determined to be fraudulent. Although it is true that the Oppenheims stabled the horses for twenty days prior to the November 23, 1979, meeting between the parties, a jury has in effect determined that the Moreaus allowed their horses onto the Oppenheims' farm because of false pretenses. No case under article 5502, V.A.T.C.S.,[14] establishes a right to a lien under these circumstances.

Next the Oppenheims argue that the court should not have allowed the Moreaus to recover damages for the period during which the horses were subject to a court injunction prohibiting their sale, pointing out that, first, the December 7, 1979, order prevented horse breeding and selling of offspring so that the Moreaus did not suffer from any interference with business relations during this period and, second, that even if the order did not prevent such actions, the harm claimed by the Moreaus

**13.** *See, e. g., Day v. Woodworth*, 54 U.S. 363, 14 L.Ed. 181 (1851).

**14.** Art. 5502, V.A.T.C.S., states:
Properties of livery or public stables shall have a special lien on all animals placed with them for feed, care and attention, as also upon such carriages, buggies or other vehicles as may have been placed in their care, for the amount of the charges against the same; and this article shall apply to and include owners or lessees of pastures, who shall have a similar lien on all animals placed with them for pasturage.

could have been mitigated. The court injunction at issue prevented the parties from taking "any steps to sell, purchase, or otherwise change the ownership status of any of the horses listed in paragraph 2 pending the hearing on motion for preliminary injunction." The order preserved the status quo ante regarding ownership status of the horses and in effect told the parties to "hold their horses." The order can plausibly be read as preventing the selling of offspring. Nonetheless, the jury awarded the Moreaus $50,000 as compensatory damages. Insofar as a portion of these damages was designed to compensate for failure to deal during the period covered by the court injunction, this was justified given the fact that the court's order, even if it did prevent the selling of offspring, would not have been necessary had the Oppenheims not breached their contract to begin with. Therefore, the harm suffered during this period was attributable to the Oppenheims' actions and not to the court order. The Oppenheims are also inappropriate parties to claim the benefit of a duty to mitigate, since there was abundant evidence that the Oppenheims actively prevented the Moreaus from registering their horses with the Arabian Horse Registry of America. Without such registration, mitigation of damage by, for example, selling of offspring was shown to be effectively impossible.

 The appellants also claim error in the court's assessment of the receivership costs. The court assessed the fees of the commercial stable that cared for the horses pending litigation as costs to the losing party. The Oppenheims allege on appeal that the parties stipulated that these costs should be assessed against the party determined to be the rightful owner of the horses. A review of the record, however, fails to convince us that this was the case. On the contrary, the court stated to the parties at post-trial conference that the receivership fees would be taxed as costs against the losing party. Appellants' other claims are entirely frivolous and merit no discussion.

The Oppenheims' extraordinary position below was that their Alduro-Raynes corporation, controlled entirely by them and with not one share owned by the Moreaus, somehow "bought" extremely valuable Arabian horses without paying their owners, the Moreaus, one red cent. The jury, able to distinguish between a gift horse and a swindle, found to the contrary of this position on evidence amply sufficient. Nothing remains to say, and here it ends.

For the reasons stated above, we grant the motion of the intervenor-appellee for termination of the receivership and award of costs and attorneys' fees but remand for determination of the proper additional costs due Zimmerman, the intervenor-appellee, for attorneys' fees incurred in this appeal.[15] We affirm the district court in all respects, including its assessment of these costs and fees against the losing parties below and its grant of post-judgment injunctive relief against the Oppenheims. We deny the appellants' plea for injunctive relief pending appeal.

AFFIRMED, REMANDED in part.

---

**15.** The attorney for the intervenor-appellee omitted to state the number of billed hours or his hourly rate in his motion for additional attorneys' fees.