**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DREWS DISTRIBUTING, INCORPORATED,
Plaintiff-Appellee,

v.

No. 97-2391

LEISURE TIME TECHNOLOGY,
INCORPORATED,
Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
G. Ross Anderson, Jr., District Judge.
(CA-96-3307-18-7)

Argued: December 1, 1998

Decided: April 5, 1999

Before MURNAGHAN, LUTTIG, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Edward Kendrick Smith, SMITH, GAMBRELL & RUS-
SELL, L.L.P., Atlanta, Georgia, for Appellant. Arthur Camden Lewis,
LEWIS, BABCOCK & HAWKINS, L.L.P., Columbia, South Caro-
lina, for Appellee. **ON BRIEF:** Herbert W. Hamilton, Walter Keith
Martens, KENNEDY, COVINGTON, LOBDELL & HICKMAN,
L.L.P., Rock Hill, South Carolina, for Appellant. Mary G. Lewis,
LEWIS, BABCOCK & HAWKINS, L.L.P., Columbia, South Caro-
lina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff, Drews Distributing, Inc. ("Drews"), was the exclusive distributor of a video gambling game manufactured by Defendant, Leisure Time Technology, Inc. ("Leisure Time"). Prior to Leisure Time's arrangement with Drews, the company had an exclusive distribution agreement with Collins Entertainment Corp. ("Collins"), which was terminated except for sales of games for Collins' own use. Plaintiff claims that Leisure Time violated their exclusive distributorship agreement by selling games to Collins for resale and directly to a Drews customer. Plaintiff brought causes of action against Defendant for breach of contract, fraud, negligent misrepresentation, and breach of good faith and fair dealing. The district court determined that Defendant had breached its exclusive distribution agreement with Plaintiff and awarded damages to Plaintiff in the amount of $3,065,656.00. Defendant now appeals.

I.

In pertinent part, the district court made the following factual findings:

Plaintiff Drews is a South Carolina corporation with its principal place of business located in Spartanburg, South Carolina. Drews is engaged in the video gaming industry in the state of South Carolina. Defendant Leisure Time is a Georgia corporation in the business of manufacturing video game machines. Collins is a South Carolina corporation with its principal place of business in Greenville, South Carolina. Collins also is engaged in the video gaming industry in the state of South Carolina.

On May 13, 1992, Leisure Time[1] entered into an exclusive "Sales
_____
[1] In September 1996, Leisure Time Casino & Resorts, Inc. purchased all of the assets and liabilities of U.S. Games, Inc. The name of the com-

2

and Distribution Agreement" with Collins (the"Collins Distribution Agreement") by which Collins was to sell Leisure Time video gaming equipment in South Carolina. As a condition precedent of the Collins Distribution Agreement, Collins was required to meet sales quotas, which it failed to do. As a result, Leisure Time informed Collins by letter dated October 8, 1993 that, pursuant to their agreement, it would no longer be the sole distributor of Leisure Time products in South Carolina.

Leisure Time contacted Hugh Andrews, President of Drews, to inquire whether Drews was interested in being the exclusive distributor of Leisure Time products in South Carolina. At that time, Drews was in the business of manufacturing and distributing several types of video gaming machines throughout South Carolina. On November 5, 1993, Drews and Leisure Time entered into the 1993 Exclusive Distribution Agreement ("1993 Agreement") for a one-year term. The 1993 Agreement made Drews the exclusive distributor for all Leisure Time products for the State of South Carolina and allowed Leisure Time to sell video machines to Collins for its own use, but not for resale. The 1993 Agreement was automatically extended for one year pursuant to paragraph 10 of that Agreement.

On November 27, 1995, Drews and Leisure Time entered into a three-year Exclusive Distribution Agreement ("1995 Agreement"). The 1995 Agreement increased Drews' minimum purchase quotas from approximately $150,000 per quarter to $2,000,000 per quarter. As partial consideration for the 1995 Agreement, Drews agreed to cease manufacturing and distributing all other similar video gaming machines. The 1995 Agreement, like the 1993 Agreement, also permitted Leisure Time to sell games to Collins for its own use, but not for resale.

Prior to the signing of the 1995 Agreement, Leisure Time sent a letter, dated September 12, 1995, to Collins asking that Collins agree that the sales of machines to Collins were for its own use and that

_____

pany was changed from U.S. Games, Inc. to Leisure Time Technology, Inc. For ease of reference, Leisure Time will be used when referring to actions of U.S. Games or its successor Leisure Time Technology.

3

they could not be resold. Collins refused to sign such an agreement. Neither this fact, nor the September 12, 1995 letter, were made known to Drews.

Marshall Armstrong, Vice-President of Operations for Collins, testified that Leisure Time was aware of the fact that Collins was selling the games it purchased to operators in South Carolina. Armstrong testified that he discussed Collins' sales with Richard Martin, Vice-President of Sales at Leisure Time, on a regular basis. In addition, a letter dated July 30, 1996 from Leisure Time to Collins states that Collins shall pay Leisure Time for Pot-O Gold video machines[2] when Collins receives payment from "its customers" for the same. Finally, Thomas Freeland, who is in charge of video sales for Collins, testified to discussions with Martin during a game show in March 1997 regarding the status of Pot-O-Gold sales by Collins in South Carolina. Freeland told Martin the number of orders he had taken from customers in South Carolina.

In late 1995, Drews learned that Collins was selling Leisure Time's video game machines in South Carolina. Drews brought to Leisure Time's attention these sales by Collins and asked Leisure Time's representatives to stop selling their products to Collins. Leisure Time denied knowledge of Collins' sales. In early 1996, Drews sent Leisure Time invoices of sales of Pot-O-Gold machines by Collins to Harris & King, an operator in South Carolina. Leisure Time testified that it investigated and found no evidence of Collins having sold games in South Carolina.

Andrews also wrote Leisure Time on March 7, 1996 and again informed the company that Drews was aware that Leisure Time was selling games to Collins for resale to customers in South Carolina. Andrews informed the President of Leisure Time, Michael Jacobsen, that this was a breach of the 1993 and 1995 Agreements and asked Jacobsen to cease selling games to Collins. Representatives of Leisure Time again denied that Leisure Time was selling games to Collins for

───────────────────────────────────────

[2] Leisure Time's primary product was Pot-O-Gold, a video gambling machine. By all accounts, Pot-O-Gold is extremely popular among game operators in South Carolina.

resale in South Carolina. In actuality, by the end of March 1996, Collins had sold over 260 games in South Carolina.

Andrews observed representatives of Collins at a trade show displaying Leisure Time's Pot-O-Gold video game machines as a product Collins distributed in South Carolina. Again, Andrews complained to Leisure Time and again Leisure Time denied that Collins was selling Leisure Time's games in South Carolina.

Leisure Time officers admit to making direct sales to customers in South Carolina despite the 1995 Agreement. Al Johnson, one of the owners of Leisure Time, admitted to selling two games himself to a South Carolina customer. In addition, in November 1995, two hundred and fifty games left Leisure Time's docks and were delivered directly to Tim's Amusement in South Carolina. While Leisure Time does not acknowledge making the sale, the company's file on the sale contains the name of a Tim's Amusement representative and his telephone numbers. Moreover, on March 14, 1997, Leisure Time shipped South Carolina-specific software to be used on the subject machines. Paragraph 16(e) of the 1995 Agreement specifically makes sales in South Carolina by anyone other than Drews the responsibility of Leisure Time, unless the sale was authorized in writing by Drews.

Finally, there were 84 Pot-O-Gold game sales on Collins' invoices that identified the sold games as "used" or"reconditioned." The records also indicate that some of these games were sold on the same day or several days after they were bought from Leisure Time. Armstrong testified that "used" meant the game had been played once.

After considering the evidence, the district court determined that Leisure Time had breached its exclusive distribution agreements with Drews. Relying on expert testimony regarding the lost profits suffered by Drews as a result of Collins' sales in South Carolina, the district court awarded Drews total damages in the amount of $3,065,656.00. It is from that judgment that Leisure Time now appeals.

Leisure Time's appeal challenges findings of fact by the district court, as well as conclusions of law and evidentiary decisions. The Court of Appeals reviews the district court's findings of fact for clear error and conclusions of law de novo. See Waters v. Gaston County,

5

57 F.3d 422, 425 (4th Cir. 1995). Under the clearly erroneous standard applied to findings of fact, the Court should reverse the findings of the district court if, after reviewing the record, it "is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). We review the district court's evidentiary decisions for abuse of discretion. See Redman v. John D. Brush and Co., 111 F.3d 1174, 1177 (4th Cir. 1997). With this in mind, we affirm the district court's determination.

II.

Defendant-Appellant Leisure Time first maintains that the district court erred in finding that its 1995 Agreement with Drews could not be terminated before the end of the third year. The termination provision of the 1995 Agreement provides as follows:

> This Agreement shall continue for three (3) years, and shall be renewable in terms of one (1) year under the same terms and conditions set forth herein at the election of Distributor, provided however, that [Leisure Time] can elect to terminate this Agreement following end of the second year of the three (3) year term or thereafter by twelve (12) months written notice to Distributor, and the Agreement will terminate at the end of the twelve (12) month notice period.

(hereinafter "Paragraph 9"). On November 25, 1996, at the end of the first year of the contract term, Leisure Time attempted to terminate the 1995 Agreement by a letter to Drews which purported to give twelve (12) months written notice of termination. Following a hearing on Drews' motion for a declaratory judgment as to the permissible termination period under the contract, the district court held that Paragraph 9 is not ambiguous and does not permit termination of the 1995 Agreement before the end of the contract's third year.

Leisure Time argues that the phrase "following the end of the second year" immediately follows the word "terminate," and thus defines when the contract may end. Under the district court's interpretation of Paragraph 9, Leisure Time insists, the phrase "following the end of the second year" should instead follow the word "elect" because

6

the phrase would define when Leisure Time may elect to terminate the contract. In the alternative, Leisure Time maintains that the terms of Paragraph 9 are ambiguous, and so the district court should have received testimony to determine the parties' intention.

Drews, on the other hand, maintains that under Georgia law,**3** which controls in the instant case, the district court's conclusion that Paragraph 9 is unambiguous and provides for a 3-year term is correct. The Supreme Court of Georgia has held that "where the terms of a contract are clear and unambiguous, the court must look to those terms alone to determine the intent of the parties." Hartley-Selvey v. Hartley, 410 S.E.2d 118, 119-20 (Ga. 1991); see also Crooks v. Crim, 285 S.E.2d 84, 87 (Ga. Ct. App. 1981) (noting that where the contractual language employed is "plain, unambiguous and capable of only one reasonable interpretation," the court cannot look beyond that language). A contract is unambiguous, "even where difficult to construe ... unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties." Crooks, 285 S.E.2d at 87; Sims' Crane Service, Inc. v. Reliance Insurance Co. , 514 F.Supp. 1033, 1036 (S.D. Ga. 1981), aff'd, 667 F.2d 30 (11th Cir. 1982). As the state supreme court noted in McCann v. Glynn Lumber Co., 34 S.E.2d 839 (Ga. 1945), "a mere lack of clarity on casual reading is not the criterion for determining whether a contract is afflicted with ambiguity .... Nor is a contract ambiguous ... merely because it may be even difficult to construe." Id. at 845.

Drews argues that the first part of Paragraph 9 binds both parties to a 3-year term, with the distributor having the right thereafter to perpetuate the contract at 1-year intervals. The second part of the paragraph, Drews contends, is a limitation on the distributor's right to perpetuate the contract beyond the 3-year term:"... provided however, that [Leisure Time] can elect to terminate this Agreement following end of the second year of the three (3) year term or thereafter by twelve (12) months written notice to Distributor, and the Agreement will terminate at the end of the twelve (12) month notice period." In order to limit Drews' right to perpetuate the contract beyond the 3

_____

**3** Under the 1995 Agreement, any dispute between Leisure Time and Drews is governed by the laws of the State of Georgia.

7

years, Leisure Time must give 12 months notice "following the end of the second year ... or thereafter."

We find Appellee's position persuasive. As a matter of law, where the contract appears on its face to be complete, i.e., to embody the entire agreement, and clear, resort to parole evidence is unnecessary. Ga. Code § 13-2-2(1); see also McCann, 34 S.E.2d at 843, 845. It is undisputed that the Agreement is complete, and, under state law, Paragraph 9 is unambiguous. The plain reading of the provision indicates that it could not be terminated before the end of the third year. A contrary reading would allow the otherwise clear and specific terms regarding the termination requirements to be altered under the guise of ascertaining the intent of the parties. Furthermore, it would render the first part of Paragraph 9 ("This Agreement shall continue for three (3) years ...") meaningless, which is inimical to Georgia law. See Ga. Code § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.").

III.

Second, Leisure Time claims that the district court erred in concluding that it breached the 1995 Agreement. The district court found that Leisure Time breached the 1995 Agreement by selling Pot-O-Gold games to Collins for resale within the State of South Carolina. The court also found that Leisure Time breached the agreement by selling games directly to Drews' customers.

The 1995 Agreement contains a provision that allows Leisure Time to sell games directly to Collins for Collins' own use, and not for sale or lease to another. Leisure Time maintains that it fulfilled its obligations to Drews by (1) conditioning all sales to Collins for Collins' own use, and (2) investigating the allegations of sales of games by Collins in South Carolina. First, Leisure Time insists that it made clear to Collins that it could only purchase games for its own use. At a meeting between Leisure Time executives and the president of Collins, Leisure Time apparently discussed the new requirement. Leisure Time later reiterated the conditional sales provision in a confirmation letter to Collins. Again, in a second letter dated September 12, 1995, Leisure Time reminded Collins that its purchase of games was condi-

8

tioned on Collins' own use of the games and that they were not for resale.

The district court determined that Collins' failure to express affirmative agreement with the confirmation letter and the September 12th letter "put [Leisure Time] on certain notice that Collins disagreed with Leisure Time and took the position it had a right to sell Leisure Time products in South Carolina." Leisure Time disputes the court's determination, arguing that the South Carolina Uniform Commercial Code,[4] § 36-2-207, provides that Collins' failure to object to the terms of the offer and the company's subsequent purchase of games constitute an acceptance of such terms. S.C. Code Ann.§ 36-2-207 (Law. Co-op. 1976).

Leisure Time fails to mention, however, that § 36-2-207 does not apply where the acceptance is expressly made conditional on assent to the additional or different terms. Id.; see also Mace Industries, Inc. v. Paddock Pool Equipment Co., 339 S.E.2d 527, 530 (S.C. Ct. App. 1986). Leisure Time's final paragraph in its letter to Collins dated September 12, 1995 can easily be construed as such an express condition: "I hope this letter of understanding meets with your approval. If so, please return one signed original." Collins did not sign the letter.

Second, Leisure Time submits that it took reasonable steps to investigate Collins' alleged resale of new games. In December 1995 or January 1996, Drews notified Leisure Time of its belief that Collins was reselling games. Leisure Time then received written notice from Drews, in a letter dated March 7, 1996, that Collins was reselling new games in South Carolina. Leisure Time insists that, in response to the notice, its representatives checked machines throughout the state to determine whether any had been sold by Collins and found none.

_____

[4] Appellant Leisure Time's reliance on South Carolina law is confounding, since the Collins Distribution Agreement, like the 1995 Drews Agreement, provides that it "shall be governed by and construed in accordance with the laws of the State of Georgia." As we explain below, however, even if South Carolina law applied, Appellant would not prevail.

9

The district court justifiably viewed Leisure Time's assertions with some suspicion, however. Leisure Time's supposed check of machines is questionable, since it did not report finding any resold machines at Harris & King, an operator in South Carolina. Drews had provided Leisure Time with actual invoices which proved that Harris & King, in fact, had purchased machines from Collins in early 1996. Furthermore, Marshall Armstrong, Vice-President of Operations for Collins, testified that Leisure Time was aware of the fact that Collins was selling the games it purchased to operators in South Carolina. Armstrong stated that he had discussed Collins' Pot-O-Gold sales with Richard Martin, Vice President of Sales at Leisure Time, on a regular basis "... ever since [Martin] has been there. The last two and a half or three years ...." Thomas Freeland, who is in charge of video sales for Collins, also testified to discussing Pot-O-Gold sales with Martin. As further evidence that Leisure Time was aware of Collins' sales, a letter dated July 30, 1996 from Leisure Time to Collins states that Collins shall pay Leisure Time for Pot-O-Gold video machines when Collins received payment from "its customers" for the same. Considering the record in its entirety, we cannot conclude that the district court was clearly erroneous in determining that Leisure Time knew the games it was supplying to Collins were being resold.

The district court further found that Collins sold 84 games that it identified as "used" or "reconditioned" on its invoices but that "many, if not all, of these games were sold as new machines, which sales were in direct conflict with Drews' contract." [5] Leisure Time maintains that it had no knowledge of Collins selling games falsely classified as "used," and is thus not liable. Leisure Time further posits that Collins' scheme to misidentify the new games as "used" establishes that Collins recognized the condition placed on the sale and attempted to evade it. Appellee, on the other hand, urges that a review of the Harris & King invoices, which it provided Leisure Time, would have revealed Collins' scheme. An invoice from Collins shows the sale of reconditioned games to Harris & King, whereas the copy of the invoice from Harris & King shows the games to be new.

_____

[5] Both Leisure Time and Drews agree that Collins' sale of used games is not prohibited by the 1995 Agreement.

The only evidence linking Leisure Time to Collins' scheme of re-labeling machines are the invoices. Leisure Time would have had no indication of the re-labeling unless it also possessed Collins' invoices, which the record does not clearly indicate. However, given the substantial evidence that Leisure Time was generally aware that Collins was reselling new games, the precise mechanism of resale seems of little relevance. Thus, the district court's determination that 42 of the 84 re-labeled games were new games that Drews would have sold but for Leisure Time's breach of contract is reasonably supported by the evidence.

IV.

Leisure Time also submits that the district court erred by admitting into evidence a bill of lading which suggested that it sold games directly to an operator in South Carolina, in violation of the 1995 Agreement. Leisure Time sold 250 games to Exporters, an Ohio company, supposedly for export out of the United States. Leisure Time maintains that it believed the games would be picked up by Atlas Van Lines at its dock in Georgia and shipped to Ohio. Instead, the games were delivered to an operator in South Carolina known as Tim's Amusement. The district court -- relying on (1) the trucking company's bill of lading which reflected the actual destination of the games, as evidenced by a handwritten alteration on the bill, and (2) Leisure Time's files for the sale in question, which contained the name of an employee of Tim's Amusement -- held that the sale of these games constituted a breach of the 1995 Agreement.

The bill was admitted into evidence by the district court under the "business records exception" to the hearsay rule, Fed. R. Evid. 803(6).[6] Leisure Time argues that because the handwritten alteration contained on the bill was itself hearsay, and did not satisfy an exception, the district court erred in admitting it. To support its contention, Appellant relies on Wilson v. Zapata Off-Shore Co., 939 F.2d 260 (5th Cir. 1991), where the Fifth Circuit reviewed third-party statements in business records and held, "if the source of the information is an outsider,

_____

[6] Marian Sauvey, General Counsel, Vice President and Corporate Secretary of Atlas Van Lines, testified that she was the custodian of the records, which are kept in the normal course of the company's business.

11

... Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have." Id. at 271.

While Appellant's argument is compelling, we are not persuaded that the handwritten information contained on the Atlas Van Lines' bill is the sort of information the Fifth Circuit intended to exclude in Wilson. The information contained on the bill in question, like every bill completed by Atlas Van Lines, was completed in the regular course of business by an employee with information provided by some client, e.g., time and place of pick-up and delivery. The custodian of Atlas' records, Marian Sauvey, laid the proper foundation for admission of the evidence, testifying that the bill was kept in the normal course of business. The Fifth Circuit's legitimate concern regarding the possible inaccuracy of information provided by a non-employee does not exist here. Sauvey (and presumably the driver who actually delivered the goods) can attest to the accuracy of the information, namely that Atlas delivered the games to the address on the bill, a South Carolina destination. Since its truthfulness can be verified, the handwritten alteration was properly considered an admissible business record. See United States v. Patrick , 959 F.2d 991, 1001-02 (D.C. Cir. 1992) (noting that where the information constituting "double hearsay" was verified by the business, it qualifies as a business record and is thus admissible); see also United States v. Zapata, 871 F.2d 616, 625 (7th Cir. 1989) (same); United States v. Lieberman, 637 F.2d 95, 101 (2d Cir. 1980) (same). We, therefore, do not find that the district court abused its discretion by admitting the entire bill into evidence.

Leisure Time further argues that, even if the bill was properly admitted, the evidence is insufficient to connect the company to the sale. As support for its contention, Leisure Time points to the testimony of Michael Connolly, the owner of Exporters, who testified that his company represented to Leisure Time throughout the transaction that the games would be exported. He further testified that Exporters sold the games to a Minnesota distributor, Casino Games International, for export.

12

The district court relied, in addition to the bill sent to Leisure Time, on evidence in Leisure Time's own files referencing an employee of Tim's Amusement with respect to the sale in question. The file contained the name of the employee and two telephone numbers, both with a South Carolina area code. Additionally, on March 14, 1997, Leisure Time shipped South Carolina-specific software to Connolly to be used on the machines in question. The evidence supports the district court's finding that Leisure Time knew that the ultimate destination for the machines was South Carolina. We, therefore, do not find that the court's determination is clearly erroneous.

V.

Finally, Appellant Leisure Time contends that (1) the available evidence does not support the calculation of damages; (2) the court did not account for Drew's failure to mitigate the alleged harm; and (3) the court improperly awarded damages for sales required by court order. We disagree.

The district court found that Drews incurred $2,500,000 in damages resulting from Collins' sales of games from August 1, 1995 through July 30, 1997. Leisure Time argues that the court's finding of damages is clearly erroneous because it ignored the fact that Drews first gave written notice of its allegations against Collins to Leisure Time by letter dated March 7, 1996. It maintains that it is not liable in damages for the sale of games by Collins prior to notice. Appellant's argument omits, however, the fact that it had actual notice of Collins' actions before Drews' March 7th letter. As Armstrong testified, he and Leisure Time's Vice-President of Sales, Richard Martin, had frequent conversations regarding Collins' sales of the Pot-O-Gold machines beginning as early as July 1995. Since the district court's award of compensatory damages is not "against the clear weight of the evidence, ... based upon evidence which is false, or [likely to] result in a miscarriage of justice," Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp., 65 F.3d 1113, 1125 (4th Cir. 1995), it must stand.

Leisure Time further challenges the evidentiary basis of the damage award on the ground that the district court based the calculation largely on the testimony of Drews' expert witness, Dr. Charles

13

Alford, who is an economist. Leisure Time complains that Dr. Alford's entire calculation of lost profit damages was founded on an assumption that Drews would have sold every game that Collins sold. Without presenting any expert evidence of its own, Leisure Time submits that Dr. Alford's assumption "was based entirely upon speculation, and cannot form a foundation for calculating lost profit damages."

As support for its contention, Appellant relies on the decision in Universal Lite Distributors, Inc. v. Northwest Industries, Inc., 602 F.2d 1173 (4th Cir. 1979). In Universal Lite Distributors, Northwest Industries, through its subsidiary Universal Manufacturing Corporation (UMC), manufactured fluorescent lamp ballast, a resistance used to stabilize a current in a circuit. Universal Lite Distributors (ULD) was UMC's exclusive distributor of ballast in the State of Maryland. In breach of ULD's exclusive distributorship, UMC made direct sales of ballast in Maryland. ULD sued UMC for breach of its exclusive distributorship agreement and recovered profits allegedly lost because of UMC's direct sales in the state. Id. at 1174. The Fourth Circuit reversed, concluding that the evidence submitted by ULD was insufficient to support its claim for lost profits. Id. at 1175-76.

Despite Leisure Time's arguments to the contrary, Universal Lite Distributors is easily distinguishable from the case at bar. First, in evaluating ULD's claim for lost profits, we applied Maryland law, id. at 1175-76, not Georgia law which governs the terms of the contract between Leisure Time and Drews. Second and more importantly, in Universal Lite Distributors, the only two items in the record to prove lost sales were the testimony of a ULD corporate official and evidence that one of the companies to which UMC sold ballasts had previously been a ULD customer. Id. at 1175. There was no disinterested, expert testimony, developed through careful study of government revenue reports and actual sales, as was the case here. The attempt to analogize the facts of Universal Lite Distributors to those of the present case is severely strained, at best.

Moreover, as Drews points out, the Georgia state courts have deemed the actual sales of a product in an area where the plaintiff was to have exclusive rights relevant to support actual damages. See Douglas & Lomason Co. v. Hall, 441 S.E.2d 870, 873 (Ga. Ct. App.

14

1994) (holding that evidence of actual commissions earned by sales representatives who took over plaintiff's sales territory was admissible to prove claim for damages, while dismissing defendant's argument that the information was irrelevant as to how much plaintiff would have earned). Consistent with state law, the district court based its calculation of damages on actual sales figures, a market analysis provided and augmented by expert testimony, and an undisputed per-machine profit margin. The evidence was sufficient to permit the district court to make an intelligent and reasonable estimate of the damage amount and, therefore, must be affirmed.

Leisure Time also claims that the district court's award is erroneous because it does not take into consideration Drews' failure to mitigate its alleged damages. Leisure Time asserts that Drews had a duty to exercise reasonable care and diligence to minimize its damages. It maintains that Drews' executives testified that Collins undercut Drews on price, resulting in lost sales to Drews, yet the company never reduced its selling price for the games in an attempt to compete with Collins.

In response, Drews submits that it would not be reasonable for it, as an exclusive distributor, to lower its price, given its sizeable commitment to purchase millions of dollars worth of product from Leisure Time. Furthermore, Drews insists, once a distributor decreases its price, the market does not allow it to return to the higher price once the improper competitor is removed. Without determining whether Drews had a duty to mitigate its damages under Georgia law, we find persuasive Drews' explanation that the suggested mitigation, i.e., price reduction, was untenable.

Finally, Leisure Time maintains that the district court's award is clearly erroneous because it includes damages for games sold by Leisure Time to Collins in compliance with the court's preliminary injunction. Prior to November 26, 1997, Leisure Time ceased selling games to Drews and Collins.[7] Drews moved for a preliminary injunction, requiring Leisure Time to resume sales to Drews. At the hearing,

_____

[7] Leisure Time's refusal to supply games to either Drews or Collins coincides with Drews' commencement of litigation against Leisure Time.

15

the district court ordered Leisure Time to resume sales to both Drews and Collins. Leisure Time maintains that it is not liable for sales to Collins pursuant to the preliminary injunction.

To the contrary, Leisure Time cannot avoid damages where the reason for its breach, i.e., the preliminary injunction, was brought about by its own misdeeds. In W.R. Grace and Co. v. Local Union 759, 461 U.S. 757 (1983), the Supreme Court recognized that a litigant cannot avoid an obligation by claiming that it had to obey a court order brought about by its own actions. Id. at 767 & n.10 (noting that where company committed itself voluntarily to two conflicting contractual obligations, company was liable for any breach committed during pendency of litigation to determine its obligations, even where district court had ordered it to abide by terms of one of those contracts); see also Moreau v. Oppenheim, 663 F.2d 1300, 1312 (5th Cir. 1981) (concluding that damages incurred during the period covered by injunction was justified "given the fact that the court's order ... would not have been necessary had the [defendants] not breached their contract to begin with"), cert. denied , 458 U.S. 1107 (1982). Leisure Time's own illegal acts necessitated the preliminary injunction. The company knew that Collins was reselling games, in violation of the 1995 Agreement with Drews, yet continued to supply Collins. Once Drews sought relief in the courts, Leisure Time stopped supplying both Drews and Collins with games altogether. It was the combined effect of Leisure Time's own actions that made the injunction necessary in the first place. Leisure Time now attempts to shift the cost of its breach to Drews, who in no way violated the terms of the 1995 Agreement. Given the circumstances, the district court was correct to include damages accrued during the injunction period in the award.

Accordingly, the judgment is

AFFIRMED.

16