# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
July 13, 2020

Lyle W. Cayce
Clerk

No. 19-30320

ACADIAN DIAGNOSTIC LABORATORIES, L.L.C.,

Plaintiff-Appellee / Cross-Appellant,

v.

QUALITY TOXICOLOGY, L.L.C.,

Defendant-Appellant / Cross-Appellee.

Appeals from the United States District Court
for the Middle District of Louisiana

Before KING, GRAVES, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Acadian Diagnostic Laboratories, L.L.C. ("Acadian") entered into two contracts with Quality Toxicology, L.L.C. ("QT") to perform lab testing. Their business relationship soon unraveled, and Acadian filed this lawsuit. The jury awarded damages to Acadian, and both sides appealed. QT says it didn't get to present its full case, so we should remand. And Acadian says it didn't get enough money, so we should vacate the judgment and replace it. They're both wrong. We affirm.

## I.

This case involves two agreements between two labs in two States. Acadian operated its lab in Baton Rouge, Louisiana. QT operated its lab in Longview, Texas. Between 2013 and 2015, the labs made two agreements to

create a reciprocal testing arrangement. Under the Acadian Referred Specimens Agreement, Acadian referred urine specimens to QT for testing. QT, in turn, agreed to pay Acadian 50% of all amounts collected for those services, after deducting a charge from Medcross, QT's billing contractor. Medcross would do all the billing, collect the funds, and deposit them in QT's account. Then QT would remit to Acadian its share of the funds. Under a second agreement, the QT Referred Specimens Agreement, the referral role flipped: QT agreed to refer specimens to Acadian for testing. As with the first agreement, Medcross billed and collected the funds. And, as with the first agreement, Medcross deposited the collected funds into QT's account. QT agreed to deduct a charge for Medcross's services and then remit 65% to Acadian.

QT and Acadian performed thousands of tests under these Agreements. But QT refused to send Acadian most of its agreed-to share of the collected funds. For example, Acadian performed lab services under the QT Referred Specimens Agreement on 2,679 specimens. QT collected at least $1,565,428 in payments for those specimens. But QT sent Acadian only $73,134.34—far less than the 65% it owed under that Agreement.

QT faced other business difficulties during this time too, which culminated in a "business divorce." Several of QT's partners left and new management came in. But the new management still did not remit the funds owed to Acadian. So Acadian sent a demand letter. When QT didn't respond,

No. 19-30320

Acadian filed this lawsuit, alleging, among other things, that QT breached both Agreements.[1]

The district court granted Acadian partial summary judgment on its breach-of-contract claims. Specifically, the district court found that QT was indisputably liable for breaching both Agreements. But Acadian's damages were another matter. The district court could not determine the effective date of the Acadian Referred Specimens Agreement, and thus could not determine when Acadian's damages began to accrue. The court left that question for the jury. As for the QT Referred Specimens Agreement, the court appears to have found no dispute about the damages for 2,027 specimens for which QT failed to pay Acadian. As to those specimens, the district court concluded "that QT owes Acadian the balance due on the QT Referred Specimens [Agreement] of $1,017,528.20, less the $73,134.34 . . . payment." The court appears to have left for the jury the question of damages for the remaining 652 specimens.

The district court also granted Acadian's motion *in limine* regarding a joint venture named ToxNet Diagnostic Laboratory Services, L.L.C. QT wanted to present testimony about ToxNet to the jury. But the district court said that evidence would be a "waste of time." Later, QT attempted to introduce

---

[1] Both Acadian and QT are LLCs. "[T]he citizenship of a[n] LLC is determined by the citizenship of all of its members." *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). "So, to establish diversity jurisdiction, a party must specifically allege the citizenship of every member of every LLC." *MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 314 (5th Cir. 2019) (quotation omitted). Both of Acadian's members are Louisiana citizens. All the various members of QT and its various corporate parents are citizens of Texas. Thus, complete diversity exists to give the court jurisdiction to hear this state-law dispute. 28 U.S.C. § 1332(a).

evidence regarding Acadian's partner in the ToxNet venture. The district court again excluded it.

The jury awarded Acadian damages for QT's breach of both Agreements. For the Acadian Referred Services Agreement, QT owed $635,032.23. And for the QT Referred Services Agreement, QT owed $269,706.50. Notably, the jury instructions and the verdict form said nothing about whether the QT Referred Services Agreement damages were for *all* specimens or just the 652 specimens on which the district court denied summary judgment.

Shortly after the jury verdict, Judge Brady, who had presided over the case, passed away. The case remained open on the docket for fifteen more months until then-Chief Judge Jackson entered final judgment for Acadian. The final judgment said nothing about Judge Brady's earlier summary judgment opinion or his damages calculation. Instead, the judgment only reflected the jury's verdict. Acadian's counsel filed for his attorney's fees but did not file any post-trial motions about this apparent inconsistency. QT filed a motion for a new trial, but it was denied.

Both parties timely appealed.

## II.

We start with QT. First, QT argues the district court incorrectly granted summary judgment on its liability for breaching the Agreements. Second, QT argues the district court erroneously stopped it from introducing evidence about Acadian's business dealings. Neither contention merits a new trial.

## A.

We review the district court's grant of partial summary judgment *de novo. Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016). As this case implicates our diversity jurisdiction, we apply Louisiana law to review

No. 19-30320

QT's liability for breaching both Agreements. *Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 285 & n.2 (5th Cir. 2009).

*QT Referred Specimens Agreement*. QT argues that the QT Referred Specimens Agreement does not obligate it to remit any money at all. Although QT, through Medcross, *in fact* collected funds for these services, QT says the Agreement actually required Acadian to collect its own bills. And hence, QT contends, it did not breach the Agreement by failing to remit Acadian's money.

The disputed provision required Acadian to use "its customary billing practices." To interpret this provision under Louisiana law, we must "determin[e] . . . the common intent of the parties." LA. CIV. CODE ANN. art. 2045. And "[t]he language of the [contract] is the starting point for determining that common intent." *Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.*, 565 F.3d 948, 954 (5th Cir. 2009). "The words of a contract must be given their generally prevailing meaning." LA. CIV. CODE ANN. art. 2047. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046.

The generally prevailing meaning of "customary" appears to be "[a]greeing with, or established by, custom; established by common usage; habitual." *Customary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1941); *Customary*, THE AMERICAN HERITAGE COLLEGE DICTIONARY (4th ed. 2002) ("Commonly practiced, used, or encountered, usual"); *accord Fullilove v. U.S. Cas. Co. of N.Y.*, 125 So. 2d 389, 394 (La. 1960) (defining "usual" as synonymous with "customary"). So, Acadian agreed to use its "habitual" or "usual" billing practices. QT appears to argue that Acadian agreed to use the billing practices that it habitually or usually used with its customers *in general*. By contrast, Acadian asserts that it agreed to use the billing practices that it habitually or usually used *with QT*—that is,

No. 19-30320

to use QT and Medcross for all billing and collections. We are thus faced with two seemingly permissible interpretations.

When the meaning of a contract provision is "doubtful," Louisiana law says that such provisions "must be interpreted in light of the nature of the contract, equity, usages, the *conduct of the parties* before and after the formation of the contract, and of other contracts of a like nature between the same parties." LA. CIV. CODE ANN. art. 2053 (emphasis added); *see also McCarroll v. McCarroll*, 701 So. 2d 1280, 1286 (La. 1997) ("[W]hen the terms of a written contract are susceptible to more than one interpretation . . . parol evidence is admissible to clarify the ambiguity and to show the intention of the parties."); *WH Holdings, L.L.C. v. Ace Am. Ins. Co.*, 481 F. App'x 894, 898 (5th Cir. 2012) (per curiam). Since the "clause in question"—customary billing practices—"does not itself clearly disclose what the parties had in mind, their intention may and can be determined by the manner in which operations under the agreement were conducted." *Book v. Schoonmaker*, 26 So. 2d 366, 369 (La. 1946); *accord Nelson v. Nelson*, 985 So. 2d 1285, 1291 (La. Ct. App. 2008).

Here, the record is entirely one-sided: It shows that QT, through Medcross, conducted all the billing and collections for these specimens. That's the agreement Acadian and QT orally made before reducing the QT Referred Services Agreement to writing. That's what QT did under the parties' other agreement, the Acadian Referred Services Agreement. And that's what QT did under this Agreement before failing to remit Acadian's share of those funds. This conduct "before and after the formation of the contract," LA. CIV. CODE ANN. art. 2053, sheds light on the bargained-for exchange between the parties and evinces an intention to have QT manage the billing and collecting before

remitting the funds to Acadian. *See Nelson*, 985 So. 2d at 1292; *WH Holdings*, 481 F. App'x at 898 & n.3.

QT points to no evidence to dispute any of this. And "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Summary judgment for QT's breach of this Agreement was thus proper. FED. R. CIV. P. 56(a).

*Acadian Referred Specimens Agreement*. QT argues it's not liable under the Acadian Referred Specimens Agreement because *Acadian* breached the Agreement first. QT says Acadian did not comply with three provisions requiring Acadian (1) to provide certain forms to QT, (2) to give certain insurance information to QT, and (3) to cooperate with QT on billing and collecting. So, while it's true that QT never paid Acadian, QT says it did not have to because these three provisions are "conditions precedent" to QT's payment obligation.

Conditions precedent in a contract—more properly called "suspensive conditions" under the Louisiana Civil Code—are "terms that suspend . . . a party's obligation until the occurrence of a condition." *Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 621 (5th Cir. 2005) (citing *S. States Masonry, Inc. v. J.A. Jones Constr. Co.*, 507 So. 2d 198, 204 n.15 (La. 1987)); *see also City of New Orleans v. Tex. & Pac. Ry. Co.*, 171 U.S. 312, 334 (1898) ("The suspensive condition, under the Louisiana Code, is the equivalent of the condition precedent at common law."). When suspensive conditions are in a contract, a party has no duty to perform its own obligations until those conditions are met. *See* LA. CIV. CODE ANN. art. 1767. But Louisiana law disfavors any finding that terms of a contract are suspensive conditions. *See S. States Masonry,* 507 So. 2d at 201. The Supreme Court of Louisiana has gone so far as to say that

"contractual provisions are construed . . . *not* to be suspensive conditions whenever possible." *Ibid.* (emphasis in original). The party seeking the benefit of a suspensive condition has the burden to show that's how the contract must be read. *Mumblow*, 401 F.3d at 621.

QT has not shown that the Acadian Referred Specimens Agreement contained suspensive conditions. For example, QT has not made any argument that "the express contract language compels such construction." *Hampton v. Hampton, Inc.*, 713 So. 2d 1185, 1190 (La. Ct. App. 1998). Nor has QT provided any evidence about the "reason and sense of the contemplated transaction," so as to explain why Acadian *had to* comply with these provisions before receiving payment. *City of New Orleans*, 171 U.S. at 334. It is not enough for QT to argue that it "was under the impression" that Acadian would fulfill these obligations, *Frantz v. Vitenas*, 347 So. 2d 284, 285 (La. Ct. App. 1977), or that it would have been "convenient, useful, [and] beneficial" if Acadian had fulfilled them, *City of New Orleans*, 171 U.S. at 334.

And it's unclear why it matters whether the Agreement contained suspensive conditions. Even if it did, QT has the burden of showing that Acadian did not meet the conditions. *Sam's Style Shop v. Cosmos Broad. Corp.*, 694 F.2d 998, 1004 (5th Cir. 1982). In this way, the "nonfulfillment" of a suspensive condition is in the "nature of an affirmative defense." *Ibid.* And as with any other affirmative defense, QT "bear[s] the burden of proving each element of [the] affirmative defense by a preponderance of the evidence." *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 697 (5th Cir. 2020); *see* FED. R. CIV. P. 56(c). QT has provided no evidence at all on this score. Therefore, QT cannot show a suspensive condition absolved its obligation to pay Acadian. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (explaining that the "opponent [of summary judgment] must do more than simply show that there is some metaphysical doubt as to the

No. 19-30320

material facts"). Summary judgment for QT's breach of this Agreement was thus proper, too.

## B.

QT next argues that the district court erred by prohibiting the introduction of evidence about Acadian's third-party business relationships at the damages trial. We review evidentiary decisions by the district court for an abuse of discretion. *United States v. Kinchen*, 729 F.3d 466, 470 (5th Cir. 2013).

QT sought to present evidence about a company called ToxNet, which was a joint venture between Acadian and the old, now-"divorced" members of QT. QT wanted to tell the jury a tale of old QT members who planned to go around the new QT management's backs to form this joint venture. QT also wanted to present testimony about a business named Zenith. And it wanted the jury to hear about "a plan [of] subterfuge," through which Acadian, Zenith, and ToxNet allegedly conspired to hold QT liable for nonpayment. This is an interesting story.

But QT fails to show how it was relevant to the damages trial. A fundamental precept of federal evidence law is that evidence must be "relevant" to be admissible. FED. R. EVID. 402. To be relevant, evidence must have a tendency to make a fact more or less probable, and that fact must be "of consequence in determining the action." FED. R. EVID. 401. Here, the action was a trial about damages—*i.e.*, how much did QT owe for breaching its two Agreements with Acadian? QT fails to show how the evidence about these third-party business relationships had *any* relevance to how much QT owed under its own Agreements with Acadian. Accordingly, the district court did not abuse its discretion in excluding this evidence. *Kinchen*, 729 F.3d at 470.

## III.

Acadian cross-appeals. It argues that the jury's $269,706.50 award for the QT Referred Specimens Agreement is too low and "not supported under

No. 19-30320

any view of the evidence at trial." Therefore, Acadian seeks "amendment of the final judgment to reflect the appropriate [*i.e.*, higher] award" of $1,344,824.71, based on the evidence at trial. In the alternative, Acadian seeks to change the judgment to $1,017,528.20 so that it reflects Judge Brady's apparent conclusion in his summary judgment opinion.

A.

As a preliminary matter, we cannot simply *amend* the jury's damages award and *increase* the damages QT must pay. That's true even if we think the evidence would support a higher figure. It has long been established that the Seventh Amendment's Re-Examination Clause—that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law"—generally prevents increasing jury awards after a verdict. U.S. CONST. amend. VII; *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935); *Taylor v. Green*, 868 F.2d 162, 164 (5th Cir. 1989) ("The court manifestly lacked power to add to the amount of the verdict for either compensatory or punitive damages."); *Wiltz v. Welch*, 651 F. App'x 270, 274 (5th Cir. 2016). Thus, Acadian's request for the entry of judgment of a higher damages figure is meritless.

Our conclusion is reinforced by the fact that the Federal Rules of Civil Procedure provide several ways for a federal litigant to seek a different damages figure than that which the jury awards. And Acadian chose exactly none of them.

First, before the jury decides anything, a litigant can seek judgment as a matter of law under Rule 50(a). FED. R. CIV. P. 50(a); *Moreau v. Oppenheim*, 663 F.2d 1300, 1311 (5th Cir. Dec. 1981); *see also Hyundai Motor Fin. Co. v. McKay Motors I, LLC*, 574 F.3d 637, 642 (8th Cir. 2009) ("If the amount of damages was in fact uncontested, [plaintiff] should have moved for the district court to decide that issue as a matter of law before the case was submitted to

the jury."). This is akin to summary judgment but at a later stage of the proceedings. And the litigant must show that there is "no valid dispute as to the amount of damages," *Moreau*, 663 F.2d at 1311, and that therefore the question should not go to the jury at all, *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) ("[T]he trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict."). In a Rule 50(a) motion, Acadian could've explained why there was no dispute as to the damages, and why no damages figure was possible except for the one Acadian sought. But Acadian did not file a Rule 50(a) motion. When a party does "not move for judgment at any time before the verdict," it has forfeited its right to seek judgment as a matter of law in this court. *Purcell v. Seguin State Bank & Tr. Co.*, 999 F.2d 950, 956 (5th Cir. 1993); *see also Hinojosa v. City of Terrell,* 834 F.2d 1223, 1228 (5th Cir. 1988).

Had Acadian filed a Rule 50(a) motion, Acadian could have renewed that motion once it heard the jury's damages award under Rule 50(b). FED. R. CIV. P. 50(b). After the filing of the Rule 50(b) motion, the district court would have had three options: (1) allow the jury's damages figure to stand, (2) order a new trial, or (3) direct the entry of judgment as a matter of law. *Ibid.* But Acadian did not file a Rule 50(b) motion. The upshot is crystal clear: "'In the absence of such a motion' an 'appellate court [is] without power to direct the District Court to enter judgment contrary to the one it had permitted to stand.'" *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400–01 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 218 (1947)).

Even without filing any motion under Rule 50, Acadian still could have filed a Rule 59 motion for a new trial on damages. FED. R. CIV. P. 59(a). Among the reasons for a new trial is that the jury's damages award is "against the weight of the evidence." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996). Acadian could have argued, like it does on appeal, that the jury's

verdict was simply not supported by the evidence at all. But Acadian did not file that Rule 59 motion. As a consequence, Acadian "is not entitled to pursue a new trial on appeal" because it failed to "make[] an appropriate postverdict motion in the district court." *Unitherm*, 546 U.S. at 404.

By failing to file *any* of these motions in the district court, Acadian forfeited its ability to seek appellate review of the jury verdict. *Ibid.*

B.

Acadian nonetheless argues that something must be done about the apparent inconsistency between the summary judgment order and the final judgment issued by the district court. After all, the district court's final judgment says nothing about Judge Brady's summary judgment opinion, which "f[ound] that QT owes Acadian the balance due on the QT Referred Specimens [Agreement] of $1,017,528.20, less the $73,134.34" that QT already paid.

Here, too, the Federal Rules of Civil Procedure provided avenues for Acadian to clear up this apparent inconsistency. One option was Rule 58. That rule allows a "party [to] request that judgment be set out in a separate document." FED. R. CIV. P. 58(d). And the Rule contemplates that the district court must pay careful attention to the preparation of this document, where, as here, the judgment may be more complicated than a general jury verdict. FED. R. CIV. P. 58(b)(2). This Rule is designed to ensure that the litigants (and appellate courts) "know precisely what the judgment is and when it was entered." 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2781 (3d ed. 2020). Rule 58 thus ensures that a district court "specif[ies] what matters: the *consequences* of the judicial ruling." *Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 737 (7th Cir. 2008).

Rule 58 plays a vital role because "[t]he judicial power vested by Article III is the power 'to render dispositive *judgments*.'" *United States v. Lavergne*,

No. 19-30320

785 F. App'x 213, 216 (5th Cir. 2019) (Oldham, J., concurring in part and dissenting in part) (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995)). And, as an appellate court, we "review[] judgments, not opinions." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). So Acadian could've used Rule 58(d) to request the entry of a final judgment that reflected both the jury verdict and the summary judgment opinion. Acadian did not do so.[2]

Once the allegedly incorrect final judgment was entered, the Federal Rules gave Acadian another chance to fix it. Within 28 days, Acadian could have sought "to alter or amend [the] judgment" under Rule 59(e). "Th[at] Rule gives a district court the chance 'to rectify its own mistakes in the period immediately following' its decision." *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) (quoting *White v. New Hampshire Dep't of Emp. Sec.*, 455 U.S. 445, 450 (1982)). Rule 59(e) even acts to suspend the ordinary time requirements to file a notice of appeal. This suspension "enable[s] a district court to . . . perfect its judgment before a possible appeal" is taken. *Id.* at 1708. And should a litigant succeed in correcting a judgment, an appeal may become "altogether unnecessary," *ibid.*, preventing needless "burdens being placed on the courts of appeals," *United States v. Ibarra*, 502 U.S. 1, 5 (1991) (per curiam). But Acadian did not file a Rule 59(e) motion.

Even after the window closed for a Rule 59(e) motion, Acadian could have considered whether to file a Rule 60(b) motion for relief from the allegedly erroneous judgment. FED. R. CIV. P. 60(b). Among the grounds for relief under Rule 60(b) are "mistake, inadvertence, surprise, or excusable neglect." *Ibid*. "A

---

[2] In fact, Acadian appears to have recognized the utility of Rule 58(d) by filing a motion *before* the jury trial. But Acadian did nothing *after* the jury trial. That is, Acadian did not file a Rule 58(d) motion when it first recognized that the jury's verdict might be inconsistent with the summary judgment opinion.

13

'mistake' under Rule 60(b)(1) includes judicial errors, but such an error must be a 'fundamental misconception of the law,' and not merely an erroneous ruling." *Webb v. Davis*, 940 F.3d 892, 899 (5th Cir. 2019) (quoting *Chick Kam Choo v. Exxon Corp.*, 699 F.2d 693, 695 (5th Cir. 1983)). And should the district court deny a Rule 60(b) motion, that denial is itself an appealable order. *Browder v. Dir., Dep't of Corr. of Illinois*, 434 U.S. 257, 263 n.7 (1978). So, Rule 60(b) motions not only allow for the district court to fix its own errors, these motions also *create* a right to appellate review of unfixed errors. *See Taylor v. Johnson*, 257 F.3d 470, 474 (5th Cir. 2001) ("A party may file a [R]ule 60(b) motion at any time within one year after judgment, even if an appeal is pending, and the denial of that motion is appealable separately from the underlying judgment.").

In fact, our circuit has an established procedure (nearly seven decades old) to allow parties to file Rule 60(b) motions during the pendency of appeals. *See ibid.* Ordinarily:

> a perfected appeal deprives the district court of all jurisdiction except for the following: "[T]he district court retains jurisdiction to consider and deny such [post-judgment] motions, . . . [and] if it indicates that it will grant the motion, the appellant should then make a motion in the Court of Appeals for a remand of the case in order that the district court may grant such motion."

*Winchester v. U.S. Att'y for S. Dist. of Tex.*, 68 F.3d 947, 949 (5th Cir. 1995) (quoting *Ferrell v. Trailmobile, Inc.*, 223 F.2d 697, 699 (5th Cir. 1955)). We express no view on whether such a Rule 60(b) motion would have been successful. We only note it was available to Acadian—and Acadian has so far ignored it.

## C.

The Federal Rules of Civil Procedure provide ample mechanisms for litigants to ensure a district court gets its post-jury-trial judgment right. These

are not "idle motion[s]." *Johnson v. New York, N.H. & H.R. Co.*, 344 U.S. 48, 53 (1952). Instead, these motions reflect the "institutional advantages of trial . . . courts" and "the unchallenged superiority of the district court's factfinding ability." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233 (1991). And they provide the district court, with the "perspective peculiarly available to [it] alone," "a last chance to correct [its] own errors without delay, expense, or other hardships of an appeal." *Cone*, 330 U.S. at 217. True, some of these motions may "seldom change judicial outcomes." *Banister*, 140 S. Ct. at 1708. But by taking advantage of them, litigants "promote[] an economic and effective appellate process, as the reviewing court gets the benefit of the district court's plenary findings." *Ibid.* (quotation omitted).

It's not clear to us the import of Judge Brady's summary judgment decision. The Federal Rules specify that it should merge into the final judgment. *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). And Acadian might be right that the merger creates an inconsistency between the jury verdict, the final judgment, and the summary judgment decision. *See Bonner v. Perry,* 564 F.3d 424, 427 (6th Cir. 2009) ("A grant of partial summary judgment merges into a final judgment and can be reviewed upon appeal of the final judgment."); *Zimzores v. Veterans Admin.*, 778 F.2d 264, 266 (5th Cir. 1985) (noting that a court can "any time before final decree . . . modify or rescind" a partial summary judgment).

But Acadian never raised this issue with the district court in any way. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 340 (5th Cir. 2005) ("An argument must be raised to such a degree that the district court has an

No. 19-30320

opportunity to rule on it." (quotation omitted)). Thus, we do not simply lack the district court's "plenary findings"; we have no "findings" on the issue at all. And we don't have them because Acadian never sought them. Since the issue of the inconsistent judgment was never raised in the district court, Acadian "forfeited its right to [raise it] on appeal." *Unitherm*, 546 U.S. at 404–05 (citing *Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a . . . right may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.")).[3]

\* \* \*

The judgment of the district court is AFFIRMED.

---

[3] Alternatively, we decline to reverse the district court because it appears to us Acadian invited the district court's error in the final judgment, if it was error at all. *Cf. United States v. Page*, 661 F.2d 1080, 1083 (5th Cir. Nov. 1981) (finding invited error when "[n]either Page nor his counsel ever objected at trial or requested a new trial, waiting instead until now to urge correction of this oversight").