# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 1, 2021

Lyle W. Cayce
Clerk

No. 20-10166

The CBE Group, Incorporated; RGS Financial, Incorporated, *on behalf of themselves and all others similarly situated*,

*Plaintiffs—Appellants*,

*versus*

Lexington Law Firm; Progrexion, Incorporated; John C. Heath, Attorney at Law, P.L.L.C., *doing business as* Lexington Law Firm,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:17-CV-2594

Before Stewart, Higginson, and Wilson, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Plaintiffs-Appellants CBE Group and RGS Financial, which furnish consumer financial information to credit bureaus, sued Defendants-Appellees Lexington Law and its vendor, Progrexion, for purportedly perpetrating a fraud in which the firm failed to disclose that it was sending letters to the companies in its clients' names and on their behalves. A jury agreed that Defendants had violated Texas law in committing fraud and fraud

by non-disclosure (though found in favor of Defendants on the Plaintiffs' claim of conspiracy to commit fraud). The district court, however, set aside the verdict regarding the fraud and fraud by non-disclosure claims and issued a judgment in favor of Defendants as a matter of law. Plaintiffs appealed.

For the reasons that follow, we AFFIRM.

## I. FACTS & PROCEDURAL HISTORY

Lexington Law is a consumer advocacy law firm that offers credit-repair services to its clients. As part of its services, the firm consults with its clients on how to challenge entries that the clients believe are incorrectly included in their credit reports, which are called negative "tradelines." The firm sends letters on their clients' behalves to data furnishers, such as CBE Group and RGS Financial, contesting the negative tradelines. The letters are formatted using one of several templates generated by Progrexion that incorporates digital copies of the clients' signatures. Lexington Law does not identify itself as the sender of the letters.

An engagement agreement, which customers must sign before engaging the firm's services, notifies prospective clients that "[c]ommunications sent by Lexington to [data furnishers] and [credit bureaus] on your behalf will be sent in your name, and will not be identified as being sent by Lexington." Elsewhere the agreement provides Lexington Law with the ability to sign and send communications on behalf of clients and in their names that "verify and/or challenge the accuracy of [the clients'] credit reports."

As early as 2010 and 2012, CBE Group and RGS Financial, respectively, began to question whether letters that they had received disputing negative tradelines and purporting to be from consumers had in fact been sent by the consumers themselves. Plaintiffs grew suspicious because the letters were "strikingly similar in format, wording, and signature" and

No. 20-10166

came in envelopes that were "similarly addressed and stamped . . . ." A pre-discovery suit filed by CBE Group in state court in January 2017 revealed the letters had been sent by Lexington Law. CBE Group received 120,716 such letters between 2015 and 2018, while RGS Financial reviewed 5,600 of them between 2014 and 2018.

In July 2017, CBE Group filed a lawsuit in a Texas court, which claimed that Lexington Law committed fraud by sending dispute letters purporting to be from consumers. Lexington Law then removed the suit to federal court. Following removal, CBE Group added RGS Financial as a plaintiff to its lawsuit and Progrexion as a defendant. As the district court observed, "In a nutshell, Plaintiffs contend that Defendants run a nationwide fraudulent credit-repair scheme, preying on financially troubled consumers by drafting, signing, and mailing frivolous dispute correspondences—all using Progrexion's patented software that generates context-based unique letters—in the name of consumers, without the consumer's specific knowledge or consent, and without identifying that the letters are from a law firm, rather than a consumer." Plaintiffs averred that they suffered damages because of Defendants' fraudulent conduct since, under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., they must investigate a challenge to a negative tradeline when a consumer, rather than a law firm, sends a dispute letter. In other words, Plaintiffs alleged that they incurred costs investigating dispute letters between 2014 and 2018 that they would not have otherwise investigated had they known the letters came from a law firm.

The operative complaint asserted claims under Texas law for (1) fraud, (2) fraud by non-disclosure, (3) tortious interference with Plaintiffs' existing contracts with creditors, (4) tortious interference with Plaintiffs'

No. 20-10166

prospective relations, and (5) conspiracy to commit fraud. Plaintiffs withdrew their tortious interference claims at trial.

Defendants did not file any dispositive motions until the close of evidence at trial when they filed for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). In their motion, Defendants argued that Plaintiffs had not satisfied the burden of proof on their claims and had not overcome the Defendants' affirmative defenses that (1) Plaintiffs' claims were time barred and (2) Plaintiffs had failed to mitigate their damages. The district court reserved judgment on the motion pending the jury's verdict.

The jury then rendered a verdict in favor of Plaintiffs on their fraud and fraud by non-disclosure claims but found for Defendants on Plaintiffs' conspiracy claim. The jury awarded (1) CBE Group approximately $513,000 in actual damages jointly against Defendants, (2) CBE Group about $1.86 million in punitive damages jointly against Defendants, (3) RGS Financial around $38,000 in actual damages jointly against Defendants, and (4) RGS Financial roughly $86,300 in punitive damages jointly against Defendants.

After trial, Defendants renewed their motion for judgment as a matter of law, which the district court granted.

Plaintiffs timely appealed the district court's dismissal of their fraud and fraud by non-disclosure claims, as well as the jury's verdict on their conspiracy claim.

## II. STANDARD OF REVIEW

The court reviews de novo a district court's ruling on a motion for judgment as a matter of law. *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 405 (5th Cir. 2007). Such a motion may be granted "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court

No. 20-10166

believes that reasonable jurors could not arrive at any contrary conclusion." *U.S. ex rel. Small Bus. Admin. v. Commercial Tech., Inc.*, 354 F.3d 378, 383 (5th Cir. 2003) (citation omitted); *see also Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004) ("A motion for judgment as a matter of law should be granted if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.'" (quoting FED R. CIV. P. 50(a))).

## III. DISCUSSION

### *A. Fraud*

Since jurisdiction here is predicated on diversity of citizenship, the court must apply the substantive law of the forum state, in this case Texas. *See Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014). Under Texas law, a plaintiff must prove the following elements to establish fraud:

> (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result. The fourth element has two requirements: the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (internal citations and quotation marks omitted). Defendants argue that Plaintiffs' fraud claim fails on the first and fourth elements. We agree.

The district court concluded that Defendants did not make any false representations (material or otherwise) when signing and sending the dispute letters because Lexington Law "had the legal right to sign its clients' names

on the correspondence it sent on their behalf to data furnishers who reported inaccurate information about the clients' credit." Indeed, Lexington Law's engagement agreement provided the firm with the ability to sign and send letters on the clients' behalves and in their names. Under Texas law, "[i]t is well settled that the attorney-client relationship is an agency relationship; the attorney's acts and omissions within the scope of his or her employment are regarded as the client's acts." *In re R.B.*, 225 S.W.3d 798, 803 (Tex. App.—Fort Worth 2007) (citing, inter alia, *Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 693 (Tex. 1986)). Given this principle, Texas courts have repeatedly upheld settlement agreements signed by attorneys on behalf of their clients. *See, e.g.*, *id.* at 803; *Wakefield v. Ayers*, No. 01-14-648-CV, 2016 WL 4536454, at *4 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016); *Green v. Midland Mortg. Co.*, 342 S.W.3d 686, 691 (Tex. App.—Houston [14th Dist.] 2011). While this case does not involve a settlement agreement, the principle stated in *R.B.* has persuasive value here.

*Attorney Grievance Commission of Maryland v. Paul*, 187 A.3d 625 (Md. 2018), upon which the district court relied in concluding Defendants had not made any misrepresentations, is instructive on this point. In *Paul*, an attorney signed a non-disclosure agreement in his client's name without disclosing to opposing counsel that he had done so. *Id.* at 632. The Maryland State Bar initiated disciplinary proceedings against the attorney, arguing that the attorney "made a knowing misrepresentation that a non-disclosure agreement being sent to the opposing parties' counsel was 'signed by [the client] and [the attorney]' and when he knew that his client had not signed the agreement." *Id.* at 635. Observing that the client gave the attorney permission to sign the agreement in his stead since the client was away on vacation, the court determined that the attorney's statement that the agreement "'was signed by [the client] and myself' cannot be construed as

'false' or 'misleading' even though [the client] did not physically sign the agreement." *Id.* at 636.

Plaintiffs object to the district court's reliance on *Paul*, specifically, and the court's conclusion that Defendants did not make any misrepresentations more generally. As to *Paul*, Plaintiffs first contend that, unlike in that case, "there is no true attorney-client relationship" present between Lexington Law and its clients. But even assuming that were true, the engagement agreements, which provide Lexington Law with the legal right to sign and send correspondence on their clients' behalves and in their names, have not been shown to be invalid. Consequently, Plaintiffs' initial attempt to distinguish *Paul* is unpersuasive.

Plaintiffs also assert that the district court's reliance on *Paul* is misplaced because Lexington Law did not discuss the dispute letters with its clients before mailing them, while the attorney in *Paul* discussed the non-disclosure agreement with his client before signing the agreement on the client's behalf. As evidence for their assertion, Plaintiffs point to deposition testimony introduced at trial in which a former Lexington Law client, Agustina Chavarria, testified that she did not understand that Lexington Law intended to send letters on her behalf. They also rely upon a recording of a phone call played at trial between another former client, Lance Garza, and a Lexington Law intake consultant in which the consultant "glossed over" how the firm would provide credit-repair services. Both Chavarria and Garza, however, signed the firm's engagement letter. While Chavarria and Garza may have misunderstood the process through which Lexington Law would represent them (and that misunderstanding may have been prompted by the firm's actions), they were still bound by the terms of an engagement agreement the validity of which is not in doubt. "Absent fraud, misrepresentation, or deceit, a party is bound by the terms of the contract he signed, regardless of whether he read it or thought it had different terms." *In*

*re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005). And the engagement agreements permitted Lexington Law to sign and mail correspondence on its clients' behalves and in theirs names. Accordingly, whether the firm discussed the dispute letters with its clients before sending them is immaterial to whether the firm misrepresented itself in the letters.

Rather than cite to any case law illustrating Defendants' conduct amounts to fraud, Plaintiffs argue that the conduct undermines the FCRA and the FDCPA. But Plaintiffs did not bring claims under those statutes. Hence, the two cases upon which Plaintiffs rely in support of their argument—*Warner v. Experian Information Solutions, Inc.*, 931 F.3d 917 (9th Cir. 2019), and *Turner v. Experian Information Solutions, Inc.*, No. 16-CV-630, 2017 WL 2832738, at *1 (N.D. Ohio June 30, 2017)—are inapposite and arguably undercut the claims they do in fact assert here. Both *Warner* and *Turner* involved consumers who claimed that Experian, a consumer reporting agency, violated their rights under the FCRA by not investigating dispute letters sent by Go Clean Credit, a credit-repair organization, on their behalves. 931 F.3d at 918–19; 2017 WL 2832738, at *1. As indicated above, the FCRA mandates that a credit-reporting agency investigate dispute letters when those letters are sent by the consumers themselves. § 1681i(a)(1)(A). The *Warner* and *Turner* courts concluded that Experian was not required by federal law to investigate Go Clean Credit's dispute letters since the FCRA only mandates that credit-reporting agencies respond to dispute letters sent "directly" by the consumer. 931 F.3d at 921; 2017 WL 2832738, at *8. Applied here, these cases suggest that Plaintiffs did not have a statutory obligation to investigate the correspondence Lexington Law sent on its clients' behalves and in their names; they do not imply that the firm made any misrepresentations when it sent the letters.

Moreover, to the extent *Warner* and *Turner* indicate that Plaintiffs were not required to investigate the dispute letters, those cases also suggest

that Plaintiffs did not justifiably rely on any representations Lexington Law may have made.[1] Before the time period during which Plaintiffs claim they were injured by Defendants' fraudulent conduct, Plaintiffs began to question whether the dispute letters had in fact been sent by consumers themselves. For, witnesses from each plaintiff testified that the letters looked "similar" as indicated by the "verbiage," "stamps," and envelope formatting. CBE Group reviewed the letters and concluded that "all of the letters were coming from the same place and . . . they were not written . . . by consumers." RGS Financial also reviewed the letters and determined that "they weren't directly [sent by] consumer[s] . . . ." Once Plaintiffs developed suspicions that the letters may not have been sent from consumers themselves, they incurred costs in investigating correspondence on their own accord rather than because of the FCRA or the FDCPA. Indeed, Plaintiffs' internal policies require them to investigate and respond to dispute letters sent by consumers and third parties alike. Thus, Plaintiffs fraud claim falls short for the additional reason that they did not justifiably rely on any alleged misrepresentations. *See N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 475 (5th Cir. 2018) ("Here, red flags, Aetna's independent investigation, and Aetna's sophistication negate any justifiable reliance Aetna had on NCMC's alleged misrepresentations.").

Additionally, Plaintiffs repeatedly observe that Defendants sent many dispute letters on behalf of a given client, sometimes even after the consumer's account had closed. They focus on testimony provided at trial by Erin Harness, an RGS Financial employee, who testified that she received 29

---

[1] Although the district court did not reach the element of justifiable reliance, this this court "may affirm on any basis supported by the record." *El Aguila Food Prod., Inc. v. Gruma Corp.*, 131 F. App'x 450, 452 (5th Cir. 2005) (citing, inter alia, *LLEH, Inc. v. Wichita County*, 289 F.3d 358, 364 (5th Cir. 2002)).

No. 20-10166

dispute letters pertaining to one account and 50 regarding another. Putting aside the fact that the witness could not confirm that those letters were in fact sent by Lexington Law, this evidence at most suggests that the firm did unnecessary work on behalf of a couple clients. It does not suggest that Lexington Law committed fraud. In truth, Harness also testified that she could not identify any client of the firm that did not provide it with permission to mail dispute letters in the client's name and on his or her behalf.

A final word as to Plaintiffs' fraud claim against Progrexion, specifically. As the district court concluded, "There is no evidence that Progrexion sent dispute letters; rather the evidence is that Progrexion provided template letters to Lexington Law Firm for its use." Hence, Progrexion cannot be liable for fraud since it, like Lexington Law, did not make any material misrepresentations. Nevertheless, Plaintiffs argue that Progrexion is still liable for fraud because it was in a master-servant relationship with Lexington Law. This argument is unpersuasive for two reasons. First, implicit in the argument is the notion that Progrexion is somehow vicariously liable for Lexington Law's fraudulent conduct. But, for the reasons discussed above, the firm did not commit fraud. Furthermore, the case upon which Plaintiffs rely in support of their argument—*Parex Resources, Inc. v. ERG Resources, LLC*, 427 S.W.3d 407 (Tex. App.—Houston [14th Dist.] 2014)—is inapt. That case addressed whether a corporate executive's contacts with the forum state were sufficient to create personal jurisdiction over a foreign corporation. *Id.* at 440.

In sum, Plaintiffs have not shown that Defendants committed fraud.

## B. Fraud by Non-Disclosure

Plaintiffs also claim that Defendants committed fraud by non-disclosure. "Fraud by non-disclosure, a subcategory of fraud, occurs when a

party has a duty to disclose certain information and fails to disclose it." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219 (Tex. 2019). To establish fraud by non-disclosure under Texas law, a plaintiff must prove:

> (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury. In general, there is no duty to disclose without evidence of a confidential or fiduciary relationship . . . . [But] [t]here may [] be a duty to disclose when the defendant . . . made a partial disclosure that created a false impression . . . .

*Id.* at 219–20 (internal citations omitted).

As an initial matter and for the reasons discussed above, Plaintiffs' fraud by non-disclosure claim must be dismissed because they did not justifiably rely on any failure of the Defendants to disclose material facts. Additionally, Plaintiffs have not shown that Defendants had a duty to disclose that they were the ones actually sending the dispute letters. Plaintiffs contend that Defendants defrauded them through partial disclosures in their correspondence that their clients were disputing negative tradelines, which in turn gave the false impression that the clients themselves had sent the letters. In support of their argument, Plaintiffs rely on *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629 (Tex. App.—San Antonio 1993, writ denied); *International Security Life Insurance Co. v. Finck*, 475 S.W.2d 363 (Tex. Civ. App.—Amarillo 1971); and *Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc.*, 941 S.W.2d 138 (Tex. App.—Corpus Christi 1995). But each of these cases stand for a different proposition, namely that one party

may have a duty to speak when it makes a partial disclosure during contract negotiations. Moreover, Plaintiffs have not shown that Progrexion disclosed any facts—material or otherwise—and so cannot be liable for fraud by non-disclosure. And as the fact that Lexington Law had the legal right to send dispute letters on their clients behalves and in their names suggests that the firm did not make any false representations, so, too, does it indicate that the firm did not create any false impressions requiring disclosure. Therefore, Plaintiffs' fraud by non-disclosure claim fails as well.

Finally, Plaintiffs argue that the facts Defendants stipulated to in a joint pretrial order "alone establish fraud and fraud by nondisclosure." In the stipulated facts, Defendants state that they do not disclose to recipients of dispute letters that they have mailed the letters on their clients' behalves, in their names, and from the clients' states of residence. They also state that they "intended that the recipient of the dispute letters treat them as if the consumer personally drafted, signed, and mailed them." But Plaintiffs do not provide any precedential support or explanation for their assertion that these facts demonstrate Defendants committed fraud and fraud by non-disclosure beyond the observation that the jury found for them on those claims. In reality, Plaintiffs stated multiple times on the record that there are no cases directly on point—from Texas or elsewhere—that buttress their claims. While we do not hold today that there are no situations in which a third party may act fraudulently when it mails dispute letters (and leave for another day what those situations may be), we can safely say that this is not one of them. To conclude otherwise would risk undermining well-settled principles of contract law and agency law that have long bound this court.

### C. Conspiracy to Commit Fraud

Plaintiffs conclude by arguing that the jury erred in finding in Defendants' favor on the Plaintiffs' conspiracy claim. However, Plaintiffs

No. 20-10166

waived this argument by failing to move for judgment as a matter of law on the claim before and after the case was submitted to the jury or for a new trial. *See Acadian Diagnostic Labs., L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 412–13 (5th Cir. 2020) ("By failing to file any [] [such] motions in the district court, Acadian forfeited its ability to seek appellate review of the jury verdict." (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006))). Thus, the jury's verdict on the conspiracy claim must stand.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.